# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-1280V
### Filed: July 2, 2025

EVE Y. THAO,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

Special Master Horner

*Richard H. Moeller, Moore, Corbett, Moeller & Meis, LLP, Sioux City, IA, for petitioner.*
*Ryan Nelson, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION[1]

On April 23, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa, *et seq.* (2012) ("Vaccine Act"),[2] alleging that she suffered a right shoulder injury as a result of a hepatitis B vaccination she received on July 13, 2020.  (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute;

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.  In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists Shoulder Injury Related to Vaccine Administration ("SIRVA") as a compensable injury if it occurs within ≤48 hours of administration of a flu vaccine.  § 300aa-14(a), *amended by* 42 C.F.R. § 100.3.  Table Injury cases are guided by a statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table.  § 300aa-14(a).  To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i)     No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii)    Pain occurs within the specified time-frame;

> (iii)   Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)     No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, a petitioner could still demonstrate entitlement to an award by instead showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). To successfully demonstrate causation-in-fact, petitioner bears a burden to show: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 300aa-13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2 (alternation in original); *see also Snowbank Enters., Inc. v. United States*, 6 Cl. Ct. 476, 486 (1984) (explaining that mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case. Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence

contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A).  The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision.  *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## II.    Procedural History

Petitioner filed an affidavit and medical records between April of 2021 and April of 2023.  (ECF Nos. 1, 6-7, 19, 24, 29, 31, 35, 37, 42; Exs. 1-13.)  The case was initially assigned to the Special Processing Unit ("SPU") based on the allegations of the petition.  (ECF Nos. 10-11.)  On September 21, 2022, respondent filed his Rule 4(c) Report recommending against compensation.  (ECF No. 39.)  Respondent argued that, rather than experiencing either a Table SIRVA or a shoulder injury caused-in-fact by her vaccination, petitioner experienced a continuation of a pre-existing injury that she had sustained while serving in the army.  (*Id.* at 10-11.)  Thereafter, in May of 2023, the case was reassigned to the undersigned.  (ECF Nos. 45-46.)

After the case was reassigned, I issued a Rule 5 Order.  (ECF No. 47.)  I advised that, based on respondent's understanding of the medical records, my preliminary view was that petitioner may not have sufficient medical basis for distinguishing her pre- and post- vaccination condition.  (*Id.* at 2.)  I cautioned that "merely placing onset of shoulder pain within 48 hours of vaccination will not suffice, without more, if [petitioner's] overall medical history is confounding."  (*Id.*)  Petitioner subsequently filed a memorandum of facts responding to respondent's recitation of the medical records (ECF No. 61.), as well as additional evidence, including a personal statement (Ex. 14),[3] a statement by her mother (Ex. 15), updated medical records (Ex. 16), Facebook messages (Ex. 17), imaging records (Exs. 18-19), and an expert report by Marko Bodor, M.D. (Ex. 20-26).[4]  (ECF Nos. 49, 51, 53, 58, 62, 65, 67, 70.)  Respondent filed a responsive expert report by Paul J. Cagle, M.D.  (ECF No. 71; Exs. A-B.)

Petitioner then requested that entitlement be resolved via a motion for a ruling on the written record.  (ECF No. 73.)  Petitioner filed her motion in July of 2024, and it was fully briefed in August of 2024.  (ECF Nos. 75-76, 79.)  I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve entitlement on the existing record.  *See* Vaccine Rule 8(d);

---

[3] Petitioner initially filed her personal statement on July 21, 2023.  (ECF No. 49.)  However, the same day, petitioner filed a corrected version of her personal statement as Exhibit 14.  (ECF No. 51.)  All citations to Exhibit 14 refer to the corrected version at ECF No. 51.

[4] Petitioner initially filed Dr. Bodor's expert report as Exhibit 20 on December 15, 2023.  (ECF No. 67.)  However, on February 28, 2024, petitioner filed an amended version of Dr. Bodor's report as Exhibit 20.  (ECF No. 70.)  All references to Exhibit 20 refer to the amended version at ECF No. 70.

Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945
F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the
record is comprehensive and fully developed before ruling on the record").  Accordingly,
petitioner's motion is ripe for resolution.

## III.    Factual History

Prior to the vaccination at issue, petitioner was injured while serving in the U.S.
army in Afghanistan.  Specifically, on March 22, 2011, petitioner was injured in a mortar
blast.  (Ex. 8, pp. 297-99, 321-22.)  While still recovering, she then suffered a head
injury on March 31, 2011, when she was hit in the back of the head by a forklift.  (*Id.* at
288-91.)  The forklift injury primarily affected the right side of her neck.  (*Id.* at 283-84.)
As a result of these events, petitioner suffered a mild traumatic brain injury, post-
concussion syndrome, headaches, and muscle spasms in the neck.  (*Id.* at 282-84, 288-
89, 293, 295, 297.)  While still in Afghanistan, petitioner subsequently presented for a
physical therapy evaluation on November 7, 2011, with complaints of muscle spasm
and backache.  (*Id.* at 276.)  Petitioner reported experiencing neck and right shoulder
pain.  (*Id.*)  She indicated that her prior symptoms from her forklift injury had resolved,
but that she was again experiencing similar symptoms.  (*Id.*)  Petitioner was unsure
whether her current pain and symptoms were related to her prior forklift injury.  (*Id.*)
She was assessed as having right upper trapezius and periscapular muscle spasms.
(*Id.* at 277.)

After she returned to the U.S., petitioner presented for follow up care for right
shoulder pain on February 9, 2012.  (Ex. 8, pp. 268-71.)  She reported that she had
been experiencing shoulder pain since March of 2011.  (*Id.* at 269.)  Petitioner
described her prior forklift accident and explained that her pain "started in her neck then
ra[d]iated down to the shoulder."  (*Id.*)  Petitioner indicated that her pain was helped by
stretching, but made worse by lifting, pressure, or long periods of sitting.  (*Id.*)  On
physical exam, petitioner's trapezius showed no pain on palpation and no spasm and
there was "no shoulder joint involvement."  (*Id.* at 270.)  However, she had pain over her
right trapezius with cervical spinal rotation and flexion.  (*Id.*)  Her physician was unclear
as to whether her intermittent trapezius spasms were related to her prior injury.  (*Id.*)
She was referred for further physical therapy.  (*Id.*)

At her physical therapy reevaluation in March of 2012, petitioner reported
consistent complaints of pain with active cervical range of motion, despite no significant
limitations or asymmetric range of motion.  (Ex. 8, pp. 252-53.)  In the course of physical
therapy, she was assessed as having cervicalgia.  (*Id.* at 242.)  On May 18, 2012,
petitioner had an MRI study of both her right shoulder and cervical spine due to her
"constant neck pain and headaches."  (*Id.* at 66.)  The right shoulder study was normal,
and the cervical spine study showed only minimal central disc bulging at C4-C5 and C5-
C6.  (*Id.* at 66-67.)  Later that month, however, petitioner began experiencing
numbness, tingling, and pain from her right shoulder down to her right hand.  (*Id.* at
186.)  She also developed a "visible" tremor in her right hand.  (*Id.* at 186-87.)  A follow
up EMG of the right upper extremity was normal.  (*Id.* at 176.)

On June 4, 2012, petitioner had a physical examination in connection with her separation from the army.  (Ex. 8, pp. 168-71.)  Although her assessment included "upper back pain (between shoulder blades)," the physical exam was normal and she was released without limitations.  (*Id.* at 170.)  However, petitioner continued to seek treatment from the VA for her right shoulder and neck pain from 2013 through 2016.  (*See generally* ECF No. 19-1 (Ex. 6).)[5]  Initially, petitioner had full range of motion and she was negative for any right shoulder impingement.  (ECF No. 19-1, pp. 644, 646.)  However, beginning in January of 2013, petitioner reported losing range of motion and her physical exam confirmed reduced range of motion in her right shoulder as well as a positive Hawkins Impingement test and a positive lift off subscapularis test.  (*Id.* at 399, 459-60, 468-69.)  She also had tenderness to palpation at the biceps tendon and reported mechanism symptoms, such as clicking or catching. (*Id.* at 468-469.)  At a follow up in December of 2013, petitioner evidenced weakness in her right deltoid upon physical examination.  (*Id.* at 483-84.)  Petitioner underwent a second EMG which was normal and showed no electrodiagnostic evidence of right cervical radiculopathy, brachial plexopathy, or peripheral neuropathy.  (*Id.* at 384-86.)

On August 18, 2014, petitioner sought veteran's disability benefits relative to multiple injuries, including right shoulder strain and cervical neck strain. (Ex. 9, pp. 84-85.)  She was released from assignment and duty for a conflict-related physical disability as of June 10, 2015.  (*Id.* at 87.)  Petitioner did not seek treatment for these issues between August of 2016 and September of 2017, but resumed physical therapy for various musculoskeletal complaints, including her right shoulder, in October of 2017.  (Ex. 2, pp. 122-23, 127.)  She continued physical therapy until April of 2018.  (*Id.* at 368.)  Thereafter, petitioner pursued acupuncture treatment for her shoulder and other issues from August of 2018 through December of 2019.  (Ex. 3, pp. 9-26, 38.)

In her second affidavit, petitioner described her pre-vaccination condition as follows:

> I had stiffness, numbing, tingling, sharp pains that ran from the back of my shoulder blade all the way down the right arm.  The pain typically started in back, under and around the right shoulder blade, and often sent the numbing, tingling, tenderness, and sharp pains down my arm to the pinky.
>
> In addition to the pain and symptoms I experienced from my service injuries, I had weakness where I sometimes could not hold things like my weapon or cell phone.  It was also difficult to lift, extend, reach behind fully because I would start feeling weakness and sharp pains at certain movements.  I think my range of motion was mostly limited due to the pain and symptoms I felt.  The inability to grip or hold things was due to the weakness and numbing sensations I felt that radiated from the back of my shoulder to my fingers.

---

[5] This exhibit is not bates stamped with exhibit page numbers.  Therefore, this exhibit will be cited by its ECF number and pin citation will be to the ECF pagination.

(Ex. 14, ¶¶ 4-5.)

Petitioner indicates that from 2012 through 2020 she "received back and forth care from chiropractors, acupuncturists, and physical therapists" which "focused on treating the pain, numbing, tingling, tenderness, weakness, shooting, burning and sharp pains that I had." (Ex. 14, ¶ 11.) However, petitioner avers that she "started to see some improvement" "around 2019" and that from that point "most of the symptoms resolved and what I experienced were sporadic sharp pains and numbing that ran down the back of my right shoulder to the fingers." (*Id.* at ¶¶ 12-13.)

However, petitioner sought a second referral for further acupuncture on July 9, 2020. (Ex. 2, pp. 88-89.) The reason for the request was "migraines, neck, right shoulder, left hip, and 1b radiculopathies." (*Id.* at 89.) She received the hepatitis B vaccination at issue on July 13, 2020, between the time of her July 9, 2020 acupuncture referral and her first acupuncture visit, which was on July 20, 2020. (Ex. 2, p. 202; Ex. 3, p. 38.) The vaccination was administered in her right deltoid. (Ex. 2, p. 202.)

Petitioner averred that "[i]mmediately after the nurse administered the vaccine, I felt this weird bubbly feeling and stiffness in and around the injection site." (Ex. 1, ¶ 5; *see also* Ex. 14, ¶ 15.) Additionally, she "felt soreness and uncomfortable pain in my right shoulder area, immediately after the vaccine was administered." (Ex. 1, ¶ 5.) She indicated that she reported these sensations to the administering nurse and was told it was normal.[6] (Ex. 14, ¶ 15.) She characterized this pain as feeling "like a bee sting." (Ex. 1, ¶ 5.) Later that day, petitioner complained of her shoulder pain to her partner, who recommended she contact a doctor, and observed that she had pain with lifting and difficulty sleeping that night. (*Id.* at ¶¶ 7-8; Ex. 14, ¶ 16.) Over subsequent days, petitioner observed limited range of motion along with difficulty with lifting, reaching, grabbling, and holding. (Ex. 1, ¶¶ 10-16; Ex. 14, ¶ 17.) However, she decided to wait to seek treatment to see if it was normal post-vaccination pain as the nurse had indicated. (Ex. 1, ¶ 14.)

Petitioner's mother submitted a statement indicating that petitioner complained of a "bubble and stinging feeling" from her vaccination a day or two after the fact, and that two to three days after that she commented via Facebook messenger that she was having difficulty clothing herself, showering, and sleeping. (Ex. 15.) Petitioner filed some Facebook messenger screenshots of messages relating to her right shoulder. (Ex. 17.) The earliest is dated August 9, 2020. (*Id.* at 2.) In it, petitioner states "I have a feeling that when I got my Hep B vaccine in late June, it's been causing a lot of shoulder/arm pain in my right arm. I think it's also causing my fatigue cause I can't sleep at night . . .." (*Id.*)

---

[6] Contrary to this account, petitioner's vaccination record states that "[t]he patient was asked to stay in the clinic for 15 min of observation following vaccination. Tolerated procedure well. Left with no new complaints." (Ex. 2, p. 202.)

Petitioner avers that her post-vaccination symptoms are different from her pre-vaccination symptoms.[7]  (Ex. 14, ¶ 22.)  She stresses that post-vaccination she experienced pain mostly in the right shoulder joint and deltoid area and that she also experienced a popping or cracking sensation.  (*Id.*)  Petitioner avers that "[b]efore the vaccine shot, I attended acupuncture treatment for unrelated reasons.  However, starting July 20, 2020, I was now being seen for the constant right shoulder pain I was experiencing in and near the injection site."  (Ex. 1, ¶ 17.)

Prior to contacting her primary care provider regarding her post-vaccination shoulder pain, petitioner presented twice to her acupuncturist, on July 20, 2020, and July 29, 2020.  (Ex. 3, pp. 37-38.)  The parties disagree as to the meaning of the resulting notations.  According to petitioner, the July 20 acupuncture record includes a note of "B Sh" (meaning bilateral shoulder pain) that is crossed out in favor of a notation of "R Sh p 2/10."  (ECF No. 61, p. 7 (discussing Ex. 3, p. 38).)  Petitioner believes that this indicates that, whereas petitioner had been pursuing acupuncture for bilateral shoulder pain, her July 20 presentation was notable for significant symptoms related to her right shoulder and only generalized discomfort in her left shoulder.  (*Id.*)  Petitioner suggests this is further reinforced by the July 29 notation of 3/10 right shoulder pain and "extreme tightness" in the right trapezius as well as infraspinatus and supraspinatus.  (*Id.* (discussing Ex. 3, p. 37).)  Respondent does not dispute the fact of these notations but does not find them to be indicative of any new or increased pain since vaccination and further notes that there is no mention of the vaccination within these encounter records.  (ECF No. 39, pp. 4-5.)

On August 8, 2020, petitioner sent a message to her primary care provider stating:

> I got my second Hepatitis B shot a few weeks ago.  I noticed some normal pain at the site, but after a few days I started noticing some pain in the shoulder and arm.  It's been a few weeks since the shot, I haven't done anything to injure it or overuse the shoulder.  When sleeping on the shoulder it's more painful and there is a constant pain and discomfort all day.  There's some limited range of motion due to pain.

(Ex. 2, p. 195.)  Petitioner was advised that this was "not abnormal" and to continue monitoring.  (*Id.*)

---

[7] In her second affidavit, petitioner states that "I have a log attached to this Affidavit to illustrate what I experienced for months.  I stopped keeping track at the end of 2020 because I got busy with work and school." (Ex. 14, ¶ 20.)  Accompanying the affidavit are two pages first with the heading "Attachment to Second Affidavit of Eve. Y. Thao" and then sub-headed "Hep B Vaccination Log – Post Vaccination."  (Ex. 14, pp. 7-8.)  The log includes entries dated from July 13, 2020 through December 30, 2020, and concludes with a notation that "I stopped keeping track of my injury because I started my Masters program in Fall 2020 . . . ."  (*Id.*)  Although petitioner specifies when she stopped keeping this log, she does not indicate when she started to keep it.  The attachment has a heading and notation that appear to be specific to this litigation and nothing in the body of the attachment confirms it to be a contemporaneously recorded log.

Thereafter, petitioner returned to acupuncture and had six sessions during August and September. (Ex. 3, pp. 35-37.) During this period, petitioner reported numbness and tingling of the right shoulder on two occasions and reported right shoulder pain of between 3/10 and 5/10, but with no specific mention of her vaccination. (*Id.*)

On October 5, 2020, petitioner contacted her primary care provider again, reporting that "I still have pain in my right shoulder, and shoulder joint. There's still tenderness there and I cannot sleep on it at night. There is still pain that radiates to and from the shoulder joint, when lifting it and exerting it . . . ." (Ex. 2, p. 183.) Petitioner was then seen by a nurse practitioner in office on October 9, 2020. (*Id.* at 181.) The record of her physical exam was limited to noting "right deltoid; negative erythema, edema." (*Id.* at 182.) The assessment was status post vaccine injection muscle pain, and she was referred to physical therapy. (*Id.*) Petitioner also continued her acupuncture sessions through April of 2021. (Ex. 3, pp. 27-33.)

Petitioner presented for her physical therapy evaluation on October 27, 2020. (Ex. 2, p. 73.) In taking petitioner's history, the physical therapist related the onset of petitioner's right shoulder pain back to her service injury ten years prior, then adding that "[s]ymptoms had been intermittent up until June, 2020 when she reports receiving a vaccination to her right deltoid causing pain to become more constant." (*Id.* at 74.) Petitioner reported her pain as being 4/10 overall, ranging from 2/10 to 8/10. (*Id.*) She characterized it as sharp pain with paresthesia at times and radiating to her hand and finger. (*Id.*) Sleeping on her right side, lifting, and reaching backward were identified as aggravating factors with no relieving activities. (*Id.*) On physical exam, petitioner had reduced range of motion and reduced strength in her right shoulder and positive signs of impingement (Speeds, Neer, and Hawkins/Kennedy). (*Id.* at 75.) She was assessed as having "R shoulder pain and dysfunction" with exam findings demonstrating bicipital and rotator cuff irritability. (*Id.* at 76.) Six sessions of bi-weekly physical therapy were recommended, which petitioner pursued through February of 2021. (*Id.* at 77, 132, 137, 141, 162.) She would later report that the physical therapy had helped, but did not resolve, her symptoms. (ECF No. 29-1 (Ex. 10), pp. 25-26.)[8]

Petitioner did not specifically seek treatment for her shoulder pain again until April of 2022. (ECF No. 29-1, p. 25.) By that time she had filed the instant action. In the interim, she did report a history of chronic shoulder pain aggravated by a subsequent hepatitis B vaccination to a new primary care provider (ECF No. 29-1, p. 42) and received subsequent vaccinations in her right shoulder (*Id.*; Ex. 4, pp. 25, 28). She moved to Thailand in July of 2021 and pursued acupuncture while there, though no records of this treatment are available. (ECF No. 17; Ex. 7, p. 5.) Petitioner averred that once she moved to Thailand it was difficult to receive regular care due to a lack of English-speaking doctors in the town where she lived. (Ex. 14, ¶ 26.)

---

[8] This exhibit is not properly bates stamped with exhibit page numbers. Therefore, this exhibit will be cited by its ECF number and pin citation will be to the ECF pagination.

Petitioner followed up with an orthopedist regarding her shoulder pain on April 13, 2022, during a return visit to the U.S.  (ECF No. 29-1, p. 25.)  She reported her history of an injury to her right shoulder that she sustained while still in service approximately ten years ago, specifically a right shoulder sprain.  (*Id.*)  Additionally, petitioner noted that after she received her hepatitis B vaccine, she started to experience "increased right shoulder pain."  (*Id.*)  At this time, petitioner reported that

> [s]he localizes the pain primarily to the anterior aspect of the shoulder.  The pain bothers her when she is running and she is unable to do push-ups because of the pain.  She reports occasional numbness and tingling in the hand since her injury in the service but only notices numbness and tingling in her hand a few times per month.  She denies any neck pain or radicular type symptoms.

(*Id.* at 26.)  On physical exam, petitioner had mild tenderness to palpation over the bicipital groove, anterior aspect of the glenohumeral joint, acromioclavicular joint, and lateral border of the proximal humerus.  (*Id.* at 27.)  She had reduced range of motion, but did have full strength.  (*Id.*)  Impingement testing was negative, but she did report pain with the empty can test.  (*Id.*)  No diagnosis was rendered, and an MRI was recommended for further evaluation.  (*Id.*)

On May 27, 2022, petitioner presented to Bangkok Hospital Pattaya in Bangkok, Thailand, with a complaint of ongoing right shoulder pain.  (Ex. 12, pp. 2-3.)[9] She received a cortisone injection.  (*Id.* at 3.)  However, petitioner returned to the hospital on June 24, 2022, complaining of continued right shoulder pain at the bicipital grove.  (*Id.* at 4.)  She reported that while the cortisone injection offered some relief, she still experienced pain in her right shoulder.  (*Id.*)  Upon physical examination, the treating provider documented that petitioner's right shoulder was tender at the bicipital groove with positive signs of impingement.  (*Id.*)  The treating provider ordered an MRI, which was unremarkable, except for a minimal low grade partial thickness tear at the articular surface of the subscapularis tendon involving the inferior fiber.  (*Id.* at 5-6, 8.)  Petitioner was diagnosed with rotator cuff syndrome.  (*Id.* at 5.)  The treating provider ordered ten sessions of physical therapy for right shoulder muscle strengthening, which petitioner completed between June 28, 2022, and July 29, 2022.  (*Id.* at 5, 19-29.)  Upon physical exam at her physical therapy sessions, petitioner had limited range of motion in her right shoulder, moderate tenderness along the right bicipital tendon, and right shoulder pain on active motion.  (*Id.* at 19-29.)

Petitioner had a second MRI performed on March 22, 2023.  (Ex. 13, p. 12.)  That MRI was interpreted as having an intact rotator cuff but showed minimal bursal fluid and bone marrow edema of the distal clavicle.  (*Id.*)  Petitioner saw an orthopedist

---

[9]  While petitioner originally filed Exhibit 12 on August 22, 2022 (ECF No. 35), she filed an amended version of Exhibit 12 on September 15, 2022 (ECF No. 37.)  All citations to Exhibit 12 refer to the amended version at ECF No. 37.  While the amended version of Exhibit 12 is erroneously bates stamped as "Denton Exhibit 12," careful review of the document indicates that the records relate to petitioner's encounter at Bangkok Hospital.  (*See* Ex. 12.)

on May 31, 2023. (*Id.* at 14.) On exam, she had full range of motion, but mild pain during Neer and Hawkins testing. (*Id.*) She was diagnosed with bicep tendonitis, subacromial bursitis, shoulder impingement syndrome, and rotator cuff tendinopathy. (*Id.* at 15.)

## IV.   Expert Opinions

### a.  Marko Bodor, M.D., for petitioner[10]

Dr. Bodor acknowledges that petitioner had a pre-vaccination history of neck and shoulder pain, but stresses that this pain was related to a trapezius and periscapular spasm affecting the back of the shoulder with no involvement of the shoulder joint and notes that her May 18, 2012 right shoulder MRI was normal. (Ex. 20, p. 1 (discussing Ex. 8, pp. 66, 270, 277).) He characterizes petitioner's initial injury as a whiplash injury. (*Id.* at 3.) He credits petitioner's account of her post-vaccination symptoms and finds notable both that petitioner's post-vaccination acupuncture records identify the right deltoid as a site of pain and that her October 2020 physical therapy records document reduced range of motion with positive signs of impingement. (*Id.* at 2 (discussing Ex. 3, p. 34; Ex. 2, pp. 72-76).) He characterizes petitioner's 2022 MRI as unremarkable but notes the 2023 MRI to have shown minimal subacromial bursal fluid. (*Id.* (discussing Ex. 12, p. 8; Ex. 13, p. 12).)

Dr. Bodor opines that petitioner's pre- and post-vaccination shoulder pain stemmed from difference sources. (Ex. 20, p. 2.) While the pre-vaccination pain represented pain in the rhomboid and trapezius stemming from the head and neck rather than a shoulder injury, "pain from the rotator cuff and bursa, the most commonly injured structures in SIRVA, is typically experienced primarily around the region of the deltoid muscle, where [petitioner] experienced new pain after the vaccination." (*Id.* at 2-3.) He further opines that "she also had some pain in the anterior shoulder, around the biceps tendon, which could stem from an element of adhesive capsulitis or referred pain from the infraspinatus muscle or tendon, which paradoxically refers pain to the anterior shoulder. (*Id.* (citing Joseph M. Donnelly et al., Travell Simons & Simons' Myofascial Pain and Dysfunction 232-33 (3d ed. 2019) (Ex. 25)).) In general, reduced range of motion, which was only objectively documented post-vaccination, correlates with conditions of the shoulder more so than conditions of the neck. (*Id.*)

---

[10] Dr. Bodor received his medical degree from the University of Cincinnati Medical School in 1987. (Ex. 26, p. 1.) He completed his surgical internship at the University of California, San Diego in 1988, and his residency in physical medicine and rehabilitation at the University of Michigan in 1993. (*Id.*) He maintains his license to practice medicine in California and is board-certified in physical medicine and rehabilitation, sports medicine, and pain medicine. (*Id.*; Ex. 20, p. 1.) Dr. Bodor currently practices in private practice and serves as a voluntary assistant professor of neurological surgery at the University of California, San Francisco and physical medicine and rehabilitation at the University of California, Davis. (Ex. 26, p. 1.) He has treated or consulted on approximately 70 patients with vaccine-related shoulder dysfunction. (Ex. 20, p. 1.) Dr. Bodor has offered expert opinions in more than fifty SIRVA cases. (Ex. 20, p. 1.)

### b. Paul Cagle, M.D., for respondent[11]

Dr. Cagle presents the timing of onset of post-vaccination symptoms as a threshold issue with respect to consideration of whether petitioner suffered a SIRVA. (Ex. A, p. 7.)  He suggests there is no medical record support for onset of shoulder pain arising within 48 hours of vaccination.  (*Id.*)  He notes that petitioner's acupuncture encounters following her vaccination make no mention of new or different right shoulder pain, and that when petitioner first reported her symptoms to her primary care provider on August 9, 2020, she reported that onset occurred "a few days" after vaccination. (*Id.*)

Dr. Cagle also does not agree that the records show, more likely than not, that petitioner suffered decreased range of motion post-vaccination.  (Ex. A, p. 7.)  Although Dr. Cagle acknowledges that petitioner's post-vaccination physical therapy records document between 80 to 110 degrees of forward flexion, her prior range of motion assessment from January 11, 2013 demonstrated 90 degrees of forward flexion, which is not a significant difference.  (*Id.* at 8.)  Similarly, the post-vaccination range of motion was documented during physical therapy as including abduction of 70 or 84 degrees compared to 100 degrees in January of 2013.  (*Id.*)

Regarding petitioner's pre-vaccination symptoms, Dr. Cagle stresses that petitioner specifically reported in October of 2020 that her symptoms began with a shoulder strain she experienced during the mortar blast in Afghanistan and that her records document a service-connected sprain of the infraspinatus, which is one of the rotator cuff muscles.  (Ex. A, p. 8 (discussing ECF No. 19-1, p. 425).)  Thus, Dr. Cagle disagrees with Dr. Bodor's assessment of the difference between the pre- and post-vaccination presentation, specifically challenging the notion that petitioner's pre-vaccination condition did not relate to the same area of her shoulder.  (*Id.*)  Moreover, Dr. Cagle notes that the fact that petitioner's pre-vaccination condition included an infraspinatus sprain is significant, because Dr. Bodor invoked rotator cuff dysfunction, and the infraspinatus specifically, in seeking identify petitioner's post-vaccination condition as consistent with SIRVA.  (*Id.* at 9.)  Dr. Cagle otherwise suggests that petitioner's history in 2012 of pain radiating down the right arm into the hand is suggestive of a cervical radiculopathy and inconsistent with a shoulder-based pathology.  (*Id.*)  He notes that a cervical basis for petitioner's shoulder symptoms would be incompatible with the fourth SIRVA criterion.  (*Id.*)

---

[11] Dr. Cagle earned his medical degree from Loyola University Chicago Stritch School of Medicine in 2008.  (Ex. B, p. 1.)  He completed his residency in orthopedic surgery at the University of Minnesota Academic Health Center and Medical School in 2013.  (*Id.*)  In 2014, Dr. Cagle went on to a complete a fellowship focusing on shoulder and elbow care at Mount Sinai Hospital, and an additional shoulder fellowship at Private Hospital Jean Mermoz/Centre Orthopaedic Santy in Lyon, France.  (*Id.*)  He is board-certified in orthopedic surgery.  (*Id.* at 2.)  Currently, Dr. Cagle serves as an associate professor of orthopedics at the Icahn School of Medicine at Mount Sinai in New York City.  (*Id.* at 1.)  Dr. Cagle focuses his clinical practice on the shoulder, and he has successfully treated patients with SIRVA.  (Ex. A, p. 2.)

Finally, Dr. Cagle asserts that petitioner "simply lacks any objective evidence of any type of vaccine-related shoulder injury." (Ex. A, p. 9.) Based on his own review of the imaging, Dr. Cagle opines that petitioner's 2022 MRI was unremarkable and stresses that it is inconsistent with SIRVA in lacking evidence of any inflammatory or fluid signals. (Id. (citing Paul J. Cagle, Jr., *Shoulder Injury After Vaccination: A Systematic Review*, Revista Brasileira de Ortopedia (Dec. 16, 2020) (Ex. A, Tab 2)).) Dr. Cagle is critical of the "multitude" of diagnoses subsequently rendered by petitioner's orthopedist in March of 2023, which he characterizes as "under-supported." (Id.) He stresses that she experienced only mild pain with Neer's and Hawkins tests and that the tests lack sensitivity and specificity. (Id. (citing E.J. Hegedus et al., *Physical Examination Tests of the Shoulder: A Systematic Review with Meta-Analysis of Individual Tests*, 42 Brit. J. Sports Med. 80 (2008) (Ex. A, Tab 3)).) Dr. Cagle notes that Dr. Bodor cites multiple different diagnoses relative to petitioner's post-vaccination presentation (rotator cuff injury, injury to the bursa, adhesive capsulitis, infraspinatus issue) without providing any medical evidence to support any of these diagnoses. (Id.) Instead, Dr. Cagle opines that no convincing diagnosis is presented. (Id.)

## V.    Party Contentions

In both her initial memorandum and her motion for a ruling on the written record, petitioner explains her disagreements with respondent's interpretation of the medical records. (ECF No. 61; ECF No. 75-1.) Petitioner argues that she has met the QAI requirements for Table SIRVA or, alternatively, satisfied the three-part *Althen* test for causation-in-fact. (ECF No. 75-1, pp. 18-28.) Based on his review of the medical history, respondent contends that petitioner has not met her burden of proof under any of the four SIRVA criteria and further that petitioner has not presented a cause-in-fact claim, especially given the lack of objective evidence of a shoulder injury. (ECF No. 76.)

### a.  Table SIRVA

Regarding her alleged Table SIRVA, petitioner addresses the first criterion (prior history) and fourth criterion (other conditions) together. (ECF No. 75-1, pp. 18-21.) Relying on Dr. Bodor's medical opinion, she argues that her pre-vaccination injury cannot explain her post-vaccination presentation, because her pre-vaccination condition mainly affected her neck and her trapezius at the back of her shoulder. (Id. at 18.) She stresses that her pre-vaccination MRI and EMG were both negative. (Id. at 18-19.) Petitioner acknowledges her disability paperwork describes her injury as a "shoulder sprain," but argues that this is not a diagnosis listed in any of her prior medical records. (Id. at 19.) She contends an isolated history indicating reduced range of motion from January 11, 2013, is an "aberration," stressing that other records found complete range of motion. (Id. at 19-20 (*comparing* ECF No. 19-1, p. 460, *with* Ex. 9, p. 105); *see also* ECF No. 79, pp. 1-2.) By contrast, petitioner argues her description of new and different pain arising post-vaccination and affecting primarily her deltoid region should be credited. (Id. at 21.) According to Dr. Bodor, this type of pain is anatomically distinct from the type of whiplash injury that explains petitioner's prior history of symptoms. (Id.)

Noting her prior combat injuries, petitioner stresses that "[s]imply because she had these injuries does not mean [she] is incapable of, or did not suffer from, a new injury following her vaccination." (ECF No. 79, p. 5.)

Respondent endorses Dr. Cagle's understanding of petitioner's medical records. (ECF No. 76, p. 13.) Thus, he argues that petitioner's pre-vaccination condition included an infraspinatus strain, contradicting Dr. Bodor's reasoning as to why the pre- and post-vaccination presentations were distinct. (*Id.* at 13-14.) Respondent further stresses that petitioner requested an acupuncture referral for the treatment of her longstanding history of right shoulder pain just four days prior to her vaccination. (*Id.* at 13.) Thus, respondent argues that petitioner's post-vaccination symptoms are explained by a pre-existing rotator cuff injury. (*Id.* at 13-14.)

The parties' arguments with respect to the third criterion (pain and reduced range of motion limited to the affected shoulder) rise or fall in conjunction with their arguments relative to the first and fourth criteria. Because respondent views petitioner's entire history, both pre- and post-vaccination as a single injury, he argues that her neck, back, and hand symptoms are incompatible with petitioner's burden of showing her condition was limited to her shoulder. (ECF No. 76, pp. 16-17.) However, because petitioner argues that her post-vaccination injury is distinct from her pre-existing symptoms, she further contends that there is no basis for contending relative to the third criterion (pain and reduced range of motion) that her alleged SIRVA was not limited to the affected shoulder. (ECF No. 75-1, p. 25; *see also* ECF No. 79, p. 4).)

Regarding the second criterion (onset), petitioner stresses that under the Vaccine Act, onset may be found in petitioner's favor even when it is not recorded in the contemporaneous medical records. (ECF No. 75-1, p. 22 (quoting § 300aa-13(b)(2)).) Petitioner argues that the lack of any notation of her vaccination in her acupuncture records should not be viewed as informative and that those records otherwise support the presence of a new type of pain. (*Id.* at 23-24.) She further argues that, because she was initially told her post-vaccination pain was normal, because she pursued acupuncture for multiple reasons, and because acupuncturist's do not generally assess causation, the silence of the acupuncture records should be expected. (*Id.*; ECF No. 79, pp. 2-3.) She urges that her two affidavits and her mother's additional statement should be credited and that they reasonably corroborated by her August 8, 2020 message to her primary care provider in which she attributed new symptoms to her vaccination. (ECF No. 75-1, pp. 22-23.) Although that message indicated that onset of symptoms occurred "a few days" after vaccination, petitioner argues that this is vague rather than incompatible with a 48-hour onset. (*Id.* at 24.)

Respondent argues, however, that there is no support for a 48-hour onset within the contemporaneous medical records. (ECF No. 76, pp. 14-16.) He argues that the acupuncture records do not support the onset of a new and distinct shoulder pain and that when she did later report her symptoms to her primary care provider, she placed onset "a few days" after vaccination, which should not be viewed as adequate given the overall circumstances. (*Id.* at 15.) Respondent argues that the Facebook messages

filed by petitioner indicate she first communicated her symptoms to her family on August 9, 2020, diminishing the credibility of her mother's statement indicating this occurred within a day or two of the vaccination. (*Id.* at 15-16.)

### b. Causation-in-Fact

Petitioner acknowledges that Dr. Bodor did not explicitly provide a theory of causation in his report but contends that the theory is implicit by the references cited, which explain how improper vaccine administration can result in injury to the subacromial bursa, rotator cuff or underlying bone. (ECF No. 75-1, p. 26.) Petitioner argues that the fact that respondent has created a Table injury based on these concepts supports the validity of such a causal relationship under the first *Althen* prong. (*Id.* (citing *L.J. v. Sec'y of Health & Human Servs.*, No. 17-59V, 2021 WL 6845593, at *14 (Fed. Cl. Spec. Mstr. Dec. 2, 2021).) Petitioner asserts that Dr. Bodor's explanation of her post-vaccination presentation as demonstrating pain, range of motion deficits, and positive functional tests is adequate to meet her burden under the second *Althen* prong. (*Id.* at 27.) Finally, petitioner argues relative to *Althen* prong three that an appropriate temporal relationship may be found up to four days post-vaccination, which petitioner argues is compatible with her report of symptoms arising "a few days" after vaccination. (*Id.* at 27-28 (citing *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140, at *8 (Fed. Cl. Spec. Mstr. Mar. 30, 2018).)

Respondent counters that petitioner may not simply rely on the concept of SIRVA to support a cause-in-fact claim. (ECF No. 76, p. 17.) Instead, respondent suggests that there should be an analysis of whether a specific shoulder-related diagnosis can be associated with vaccine administration. (*Id.*) Citing Dr. Cagle's competing explanation, respondent argues that Dr. Bodor's opinion is inadequate to establish that petitioner suffered a shoulder injury consistent with a SIRVA-type injury because there is a lack of objective evidence to support the presence of inflammation or any specific diagnosis. (*Id.* at 17-18.) Moreover, none of petitioner's treating physicians attributed her condition to her vaccination. (*Id.* at 18.) Respondent also asserts that petitioner cannot meet the third *Althen* prong on this record. (*Id.*) Although respondent asserts based on Dr. Cagle's opinion that petitioner's condition is related to her prior service injury, he did not argue that there is sufficient evidence for him to meet his own shifted burden of proof to demonstrate a factor unrelated to vaccination as the cause of petitioner's injury. *See* § 300aa-13(a)(1)(B).

### VI.    Analysis

### a. Table SIRVA

The first SIRVA criterion requires that there be "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration." 42 C.F.R. § 100.3(c)(10)(i). Importantly, however, the first SIRVA criterion only addresses prior shoulder dysfunction "that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." *Id.*

Relatedly, the fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy)."  42 C.F.R. § 100.3(c)(10)(iv).

Consideration of the fourth SIRVA criterion "requires consideration of a petitioner's medical condition as a whole."  *Record v. Sec'y of Health & Human Servs*., 175 Fed. Cl. 673, 680 (2025).  However, while the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation."  *French v. Sec'y of Health & Human Servs*., No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023).  Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis.  *Durham v. Sec'y of Health & Human Servs*., No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).  Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms.  *Id.*

Here, while Dr. Bodor acknowledges petitioner to have had prior injuries, he opined that her prior condition does not explain her subsequent presentation.  (Ex. 20.)  Specifically, he opined that while petitioner's pre-vaccination condition related to her rhomboid and trapezius, her post-vaccination condition related to her rotator cuff and bursa.  (*Id.* at 2-3.)  Thus, he opined that the former would not explain the signs and symptoms of the latter.  (*Id.*)  This is not persuasive given the record at issue.

Following her injuries in Afghanistan, petitioner's first physical exam upon return to the U.S. in February of 2012 specifically documented that her condition included "no shoulder joint involvement."  (Ex. 8, p. 270.)  A subsequent exam likewise found an absence of signs of right shoulder impingement.  (ECF No. 19-1, pp. 643, 646.)  In the course of her treatment, petitioner was assessed as suffering cervicalgia (Ex. 8, p. 242) and her prior right shoulder MRI from May of 2012 had been normal (*Id.* at 66.).  These initial records would seem to support Dr. Bodor's view.  However, petitioner's subsequent records document reduced range of motion (flexion and abduction) of her right shoulder beginning in January of 2013 and her physical examination demonstrated positive impingement signs (Hawkins) with a positive sign for subscapularis involvement and deltoid weakness.  (Ex. 19-1, pp. 468-69, 483-84.)  Thus, as Dr. Cagle observed, petitioner's ultimate grant of disability included a right shoulder infraspinatus strain.  (*Id.* at 459-60.)  Petitioner is not persuasive in arguing that the findings relative to her rotator cuff were merely an aberration.  (ECF No. 75-1, pp. 19-20.)  Not only were these findings, which were supported by physical examination, credited as part of her disability status, but even subsequent to having initiated this action, petitioner reported to her medical providers that her service injury included a right shoulder strain.  (ECF No. 29-1, p. 25.)

Therefore, Dr. Cagle is persuasive in concluding that petitioner's pre-vaccination condition included a shoulder strain affecting the rotator cuff and Dr. Bodor is not persuasive in trying to distinguish petitioner's pre-vaccination condition as including only a cervical neck injury affecting the trapezius and periscapular muscles. (*Compare* Ex. 20, p. 1, *with* Ex. A, p. 8.) Moreover, Dr. Bodor based his opinion on the incorrect assumption that petitioner experienced objectively documented reduced range of motion only after the vaccination at issue. (Ex. 20, pp. 2-3.)

While petitioner averred that her prior condition had improved in 2019 (Ex. 14, ¶¶ 12-13), she acknowledged ongoing "sporadic" shoulder pain even after that point and had sought to resume treatment for her service injuries, including right shoulder pain, shortly before the vaccination at issue (*Id.*; Ex. 2, pp. 88-89). When petitioner presented for physical therapy relative to her post-vaccination shoulder pain, she demonstrated reduced range of motion (again, flexion and abduction) and reduced strength as well as positive signs of impingement (Speeds, Neer, and Hawkins/Kennedy), similar to her prior examination. (Ex. 2, pp. 73, 75.) Dr. Cagle further explained that petitioner's post-vaccination reduced range of motion was not more severe than the reduced range of motion she experienced pre-vaccination. (Ex. A, p. 8.) Petitioner sought to distinguish her post-vaccination symptoms by averring that she experienced pain in the deltoid area as well as a popping or cracking sensation. (Ex. 14, ¶ 22.) However, her prior records confirm that pre-vaccination she was likewise experiencing mechanical symptoms, such as clicking, as well as tenderness and weakness around the biceps and deltoid. (ECF No. 19-1, pp. 483-84, 468-69.) Petitioner's subsequent treatment was thin; however, both experts agree that her subsequent 2022 MRI was unremarkable. (Ex. 20, p. 2; Ex. A, p. 9.) Thus, imaging did not confirm any new shoulder pathology and her ultimate diagnosis from her treating orthopedist included rotator cuff tendinopathy. (Ex. 13, p. 15.)

Accordingly, there is not preponderant evidence that petitioner was free of any history of pain, inflammation or dysfunction of her right shoulder that would explain her alleged post-vaccination condition, as required by the first SIRVA criterion.

In light of this finding, I further find that Dr. Cagle is more persuasive than Dr. Bodor in opining as to whether petitioner's prior service injury would explain her post-vaccination symptoms. While petitioner's medical history is complicated, the persuasiveness of Dr. Bodor's conclusion is hindered by his reliance on factual assumptions running counter to the facts as I have ultimately found them. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that "[t]he special master concluded that the expert based his opinion on facts not substantiated by the record. As a result, the special master properly rejected the testimony of petitioner's medical expert."); *Dobrydnev v. Sec'y of Health & Human Servs.,* 566 F. App'x 976, 982-83 (Fed. Cir. 2014) (holding that the special master was correct in noting that "when an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion"); *Bushnell v. Sec'y of Health & Human Servs.,* No. 02-1648V, 2015 WL 4099824, at *12 (Fed. Cl. Spec. Mstr. June 12, 2015) (finding that "because Dr. Marks' opinion is based on a false

assumption regarding the onset of J.R.B.'s condition, and the incorrect assumption of a 'stepwise regression' after each vaccine administration, it should not be credited"). Namely, Dr. Bodor's purported ability to distinguish petitioner's alleged SIRVA from her prior service injury is premised on the absence of a prior rotator cuff injury and a new onset or reduced range of motion occurring post-vaccination. But this is not petitioner's presentation. Absent added expert analysis, petitioner's medical records are not otherwise sufficient to distinguish her alleged SIRVA from her pre-existing injury.

In reaching this conclusion, I have also considered petitioner's account that she experienced an abrupt onset of pain and that she experienced unusual pain during the injection. (Ex. 14, ¶ 15.) Because SIRVA is itself broadly defined as an unspecified musculoskeletal injury affecting the shoulder (42 C.F.R. § 100.3(c)(10)), alternative explanations based on conditions or abnormalities intrinsic to the shoulder raise a potentially more difficult question. *See Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *12-13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *see also Durham*, 2023 WL 3196229, at *14 n.11. A finding that a petitioner has preexisting shoulder pathology does not *per se* preclude a finding that a Table SIRVA exists. *Lang*, 2020 WL 7873272, at *13. Rather, in that context the question is "whether petitioner's own clinical history indicates that her shoulder pathology wholly explains her symptoms independent of vaccination." *Id.*; *see also, Molina v. Sec'y of Health & Human Servs.*, No. 20-845V, 2024 WL 4223393, at *8 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (finding that petitioner's diagnosis of calcific tendinitis precluded a Table SIRVA under the fourth SIRVA criterion because it is "a condition that can in itself present with acute onset of shoulder pain").

Although I do not doubt the sincerity of petitioner's account, I cannot credit petitioner's recollection as reliable because it is contradicted by the contemporaneous records. Specifically, petitioner's vaccination record confirmed that she "[t]olerated procedure well. Left with no new complaints." (Ex. 2, p. 202.) And when she first reported her post-vaccination shoulder pain to her primary care provider, she explained that "I got my second Hepatitis B shot a few weeks ago. I noticed some normal pain at the site, but after a few days I started noticing some pain in the shoulder and arm." (*Id.* at 195.) Any argument that the vaccination record's report of no new complaints should be viewed as merely pro forma is fatally undercut by petitioner's explicit confirmation to her primary care provider that she perceived her initial post-vaccination pain as "normal." And, even if petitioner's report of more significant pain occurring "a few days" post-vaccination was credited as being consistent with her burden of proof under the second SIRVA QAI criterion (pain beginning within 48-hours), this would not be dispositive regarding the fourth criterion. *Pulsipher v. Sec'y of Health & Human Servs.*, No. 21-2133V, 2025 WL 1364203, at *11 (Fed. Cl. Spec. Mstr. Apr. 24, 2025) (explaining that "[e]ven assuming *arguendo* that petitioner met her burden of proof under the second criterion, the issue here would still be that she has not preponderantly demonstrated that the pattern of onset she experienced is incompatible with glenohumeral osteoarthritis being the explanation for her symptoms irrespective of her vaccination"). While petitioner recalls a distinct onset of shoulder pain following vaccination, this is potentially consistent with her assertion that the pain she experienced

due to her prior injury continued presenting "sporadically" beginning in 2019, even if an episode occurred within 48 hours of vaccination.  (Ex. 14, ¶¶ 12-13.)

Thus, the evidence also preponderates in favor of a finding under the fourth SIRVA criterion that petitioner's post-vaccination condition is explained by her prior service injury.

### b.  Causation-in-Fact

Causation-in-fact is determined by the three-part *Althen* test.  Under the first *Althen* prong, petitioner must present a general medical theory explaining that the vaccine in question "can" cause the type of injury in question.  *Pafford*, 451 F.3d at 1355-56.  Under the second and third prongs, petitioner must present evidence that the vaccine "did" cause petitioner's own injury.  *Id.*  The third prong asks whether the timing of injury in this specific case aligns with what would be expected under the general theory presented under *Althen* prong one.  *Id.* at 1358.  The second *Althen* prong examines the petitioner's own medical history to see if a logical sequence of cause and effect exists to support vaccine causation.  *Althen*, 418 F.3d at 1278.  Here, even granting petitioner the assumption that she met her burden of proof under the first and third *Althen* prongs, she still cannot prevail under *Althen* prong two.

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records.  *Althen*, 418 F.3d at 1278; *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1375-77 (Fed. Cir. 2009); *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006); *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992).  In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight.  *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1280) (stating that "medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'").  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated.  *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) (stating that "there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").  Ultimately, petitioner may support her claim either through her medical records or by expert opinion.  § 300aa-13(a)(1).

The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning."  Satisfying *Althen* prongs one and three serves largely as a threshold demonstration that a petitioner's claim is even possible.  The Court explained that

19

There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine. A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

*Capizzano,* 440 F.3d at 1327 (emphasis in original). Thus, it is well established that in terms of demonstrating specific causation, temporal association alone is not enough to satisfy petitioner's burden of proof. *See*, *e.g.*, *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom. Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. by J.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *aff'd*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012).

Here, none of petitioner's treating physicians opined that she suffered right shoulder dysfunction caused by her vaccination. While petitioner's primary care physician did accept petitioner's history to the extent of documenting muscle pain status post-vaccination (Ex. 2, p. 182), neither her physical therapist nor the orthopedist who diagnosed rotator cuff pathology opined that her shoulder dysfunction was vaccine-caused (*Id.* at 76; Ex. 13, p. 15). Moreover, as discussed above relative to petitioner's Table Injury claim, petitioner's expert is not persuasive in seeking to distinguish petitioner's alleged post-vaccination injury from her preexisting injury. Instead, both petitioner's pre- and post-vaccination conditions included pain stemming from rotator cuff dysfunction and her 2022 MRI did not demonstrate any new shoulder pathology. As Dr. Cagle explained, the only evidence affirmatively supporting the presence of a shoulder injury post-vaccination is the finding of positive signs of impingement (Ex. A, p. 9); however, as previously explained, these signs were also present prior to vaccination. Additionally, while petitioner recalls a distinct onset of shoulder pain following vaccination, this remains consistent with her reported history of pain occurring "sporadically" beginning in 2019. (Ex. 14, ¶¶ 12-13.) Also of note, she had otherwise sought to resume treatment of her broader service-related musculoskeletal complaints, which encompassed right shoulder pain, just days prior to the vaccination at issue. (Ex. 2, pp. 88-89.) Moreover, the contemporaneous records do not support her recollection of an unusual response to injection. (*Compare* Ex. 14, ¶ 15, *with* Ex. 2, pp. 195, 202.)

On the whole, petitioner underwent limited treatment of her condition and there is minimal treater opinion or medical evaluation from which to draw any inferences. And,

given that Dr. Bodor's factual assessment is less persuasive than Dr. Cagle's, expert medical opinion favors respondent's explanation of events. Accordingly, petitioner has not presented preponderant evidence of a logical sequence of cause and effecting indicating that her vaccine was a substantial contributing factor and but for cause of her shoulder pain.

## VII.    Conclusion

Petitioner has my sympathy for the pain she has endured, and I do not doubt her sincerity in bringing this claim. However, for all the reasons discussed above, she has not met her burden of proof. Petitioner stressed in her reply brief that she "suffered for years following two terrible injuries sustained while serving her country. Simply because she had these injuries does not mean Petitioner is incapable of, or did not suffer from, a new injury following her vaccination." (ECF No. 79, p. 5.) I do not take this point lightly. Careful consideration has been given to ensure that petitioner is not worse off than other similarly situated petitioners in seeking to prove her claim simply because she served and sacrificed for her country. However, the evidence clearly indicates that petitioner's service injury for which she was placed on disability encompassed a right rotator cuff injury and there is little to no evidence, apart from petitioner's subjective account, to substantiate any distinct post-vaccination shoulder injury. Therefore, this case is dismissed.[12]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

[12] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.